Carl W. Claeson and Ruth Claeson, Plaintiffs-Appellees, v. Gilbert H. Hennessey, Defendant-Appellant.

Gen. No. 10,160.

Third District.
February 17, 1959.
Released for publication March 5, 1959.

Giffin, Winning, Lindner & Newkirk, of Springfield (C. Terry Lindner and Gilbert H. Hennessey, Jr., Prentice H. Marshall, of counsel) for defendant-appellant.

Chapin & Chapin, of Springfield, for plaintiffs-appellees.

JUDGE REYNOLDS delivered the opinion of the court.

The plaintiffs Carl W. Claeson and Ruth Claeson, husband and wife sued Gilbert H. Hennessey for $7620 claiming a breach of a written contract entered into by the parties on the 5th day of May 1956. The defendant Gilbert H. Hennessey was engaged in the florist business in Springfield, Illinois under the name of Hennessey Florist and had been in business some forty years. In the March issue of the "Florist's Review," a florist trade journal, the defendant advertised under "Help Wanted" for a man to work in greenhouse work and to get into the florist business. The plaintiffs were

then living in Denver, Colorado and working for the "Newberry Greenhouse" of that city. The plaintiffs read the advertisement and Carl W. Claeson answered it and there was some correspondence between him and the defendant. In May 1956, the plaintiffs came to Springfield and as a result of their meeting and conference with the defendant, a written contract was entered into between Hennessey and the plaintiffs. By the terms of this written agreement, the Claesons were to become full time employees of the business beginning July 9, 1956. The basic compensation of the plaintiffs was to be $6500 per year, payable at the rate of $125 per week, to be paid as follows:— $50 cash salary, rent of an apartment at the rate of $15 per week, and withholding tax of $10 per week, and the balance of $50 per week was to be credited on stock purchase of a corporation to be formed of the Hennessey business. In the agreement, defendant agreed to incorporate the business with authorized capital stock of $100,000, consisting of 10,000 shares of $10 par value. The incorporation was to be done within six months after the date of the agreement. Defendant was to transfer all the assets of the business, excepting certain real estate to the corporation. There was a bonus provision for division of net profits over 6% of the book value of the issued stock, the division to be equal between the Claesons and the defendant. The unpaid $50 per week was to be credited to a stock purchase account of the plaintiffs, to be applied on their purchase of the stock of the corporation. Adjustment of the stock purchase matter was to be made semi-annually between the parties. This crediting of the $50 per week to the plaintiffs was to continue until the plaintiffs had acquired 49% of the stock, and after that the periodic transfers of stock was to stop and the amount credited to the employee stock purchase account was to accumulate until it was sufficient to purchase defendant's remain-

439

ing 51%. It was also agreed that while the plaintiffs would be minority stockholders, that the defendant would so vote his shares of stock as to give the plaintiffs representation on the board of directors of the corporation as long as they remained stockholders and employees of the corporation. If at any time the plaintiffs terminated their employment or ceased to work for the corporation, their stock was to be offered to the defendant at book value.

The plaintiffs went to work for the defendant on July 9, 1956, and remained in employment until January 12, 1957. At that time they served a written demand and notice upon the defendant, demanding that he comply with Paragraph 7 (b) of the contract, namely the crediting the unpaid portion of their salary for twenty-seven weeks, and notice that unless this was done, they would consider the contract breached, would terminate their employment and would hold the defendant liable for said unpaid portion of their salary and for damages. The defendant did not comply with this demand and the plaintiffs quit. On January 25th 1957, they instituted their suit against the defendant for $7620. After suit was started the defendant, on January 27, 1957, incorporated the business under the name of "Hennessey Florist, Inc.," with a capital structure as stated in the agreement between himself and the plaintiffs. On January 31, 1957, he tendered to the plaintiffs 135 shares of the capital stock of the corporation and offered to elect one of the plaintiffs to the board of directors of the corporation, upon their resuming their employment. During the trial this tender was renewed.

After the plaintiffs came to work the business decreased and the defendant testified that he put about $4000 of his money, borrowed on his life insurance, into the business to meet payrolls and expenses, and that for some time during the six months' period from July

440

to January he was only taking out as salary the sum of $75 per week. It is admitted that a cash refund of money held for withholding taxes was made to the plaintiffs and that during the period they were employed they received in cash or rent the sum of $75 per week.

There is testimony that the plaintiff Carl W. Claeson became dissatisfied with his work and some evidence that Mrs. Claeson told other employees of his dissatisfaction but there was no discussion between Carl W. Claeson and the defendant about his dissatisfaction. Some time in the latter part of December 1956, according to the testimony of Ruth Claeson, she had a conversation with the defendant at the greenhouse. That at that time the defendant told her, in response to a request for a meeting, that he saw no reason for a meeting; that he did not intend to form the corporation; that he didn't have the money to pay for one at that time, and if they, the Claesons wanted to keep on working for the $75 they were getting they could stay, and recommended that if they were not satisfied, they get jobs elsewhere; that she asked him about the balance of their salary, and he told her "that was just paper and didn't amount to anything"; that she then asked him if he meant that they, the Claesons, were not going to get any more than they had already received and he replied "that was what he meant." This plaintiff also testified the day after they quit, the defendant talked with her and told her the business had lost $4000, and he couldn't incorporate with that kind of debt; that if he incorporated at all it would be six or seven years, and if he did incorporate, they would be liable for their portion of the $4000 debt.

The Claesons went back to their former employment in Denver, Colorado on April 1st, 1957, and Mrs. Claeson worked part of the period between January

12, 1957 and April 1, 1957 at housework and earned $121.40. Claeson also worked during this period and earned $340.

The evidence shows that defendant Hennessey had more than one greenhouse, and when the plaintiffs came to work for him, plaintiff Carl W. Claeson worked for several weeks repairing one greenhouse with materials salvaged from another.

There was testimony on both sides as to arrangements for meetings of the parties, but these meetings never materialized, and no agreement between the parties was worked out. The plaintiffs claimed that the arrangements for the meetings were indefinite and the defendant claimed he and his wife waited twice for the plaintiffs to show up for meetings but they did not come.

Carl W. Claeson testified he had conversations with the defendant in October and possibly in November and the defendant told him then that the business was losing money. In these conversations Claeson said he asked for a meeting and the defendant said a meeting could be arranged in the future. There was some testimony that the defendant asked the Claesons in October 1956 if they were going to stay on with the business and Carl W. Claeson told him they were. Later in December 1956 he again asked this question and did not receive any answer until he received their notice and demand of January 12, 1957.

The case was heard by the court and the court entered judgment for the plaintiffs in the amount of $3120. From that judgment the defendant appeals to this court.

The defendant raised three questions in his appeal. 1. The defendant has performed or tendered performance of all material obligations under the contract and the plaintiffs have suffered no recoverable damages. 2. Plaintiffs were obliged to mitigate their dam-

442

ages up to the time of trial. 3. The judgment is grossly excessive.

Defendant cites four cases in support of the first point of his appeal, namely that the defendant, after the plaintiffs had quit their employment with the defendant, performed or tendered performance of all of his material obligations under the contract and accordingly the plaintiffs had suffered no recoverable damages. None of these four cases support this theory. The four cases cited, all relate to employees suing for breach of contract, and in each instance the court held there was no breach because none of them had been employed for a definite time.

The precise point raised, does not seem to have been decided in Illinois. The plaintiff cites a number of cases but they are decisions on other points that only indirectly apply to this case. The case of Trawick v. Peoria & Ft. C. St. R. Co., 68 Ill. App. 156, holds that when a person is employed for a stated time at stipulated monthly wages and is notified of a reduction in his wages before the expiration of the term, if he accepts the reduction and continues in the employment, it would constitute a modification of the original contract, but he is not bound to accept the reduction but may sue and recover his salary according to the terms of the contract. In the case of Alvey-Ferguson Co. v. Ernst Tosetti Brewing Co., 178 Ill. App. 536, the court said: "In Lake Shore & M. S. R. Co. v. Richards, supra, it is said (p. 80): 'It is well settled that where one party repudiates the contract and refuses longer to be bound by it, the injured party has an election to pursue either of three remedies: He may treat the contract as rescinded, and recover upon *quantum meruit* so far as he has performed; or he may keep the contract alive for the benefit of both parties, being at all times himself ready and able to perform, and at the end of the time specified in the contract for performance, sue and

recover, under the contract; or he may treat the repudiation as putting an end to the contract for all purposes of performance, and sue for the profits he would have realized if he had not been prevented from performing.' . . . If the injured party has the right of election, it would be manifestly absurd to say that the other party may control the exercise of that right, . . . ."

In the case of Dikeman v. Sunday Creek Coal Co., 184 Ill. 546, the time element was involved. In that case, there was a lease of certain coal lands for a term of ten years, with the right of renewal of the lease by giving the owner 20 days notice of the intention to renew. The lessee failed to give such notice 20 days before the expiration of the term and the court held that because the time was specified in the contract, that the time was a very essential part of the contract and held that the lessee lost its right of renewal by failing to comply with the renewal notice provision of the contract within the time limit.

In the instant case it was provided that Hennessey would incorporate the business as soon as reasonably could be done after the plaintiffs commenced employment, but in any event the incorporation and transfer of the business to the corporation was to be accomplished on or before six months after the commencement of employment. The plaintiffs went to work July 9, 1956. When they gave the defendant the notice of breach of the contract the six months' period for incorporation had expired. It would seem clear that here there were two breaches, one the failure to incorporate as agreed to and contracted, and the other the statement by the defendant to Mrs. Claeson that the stock agreement was paper and worthless, and that they would have to take $75 per week in full compensation or seek employment elsewhere. The action of the defendant, in effecting the incorporation

444

and the offer to transfer the stock due them if they would come back, comes too late. The breach had occurred and, the plaintiffs under their right of election, elected to consider the contract terminated and sue for damages. Here is a case of "a burnt child fearing the fire." The plaintiffs had entered into a definite contract with the defendant. The defendant not only breached it by attempting to reduce the compensation due the plaintiffs under the contract, but he breached it by failing to incorporate as provided in the contract. Further, he stated, according to his own testimony, that he did not contemplate incorporating for at least two years. The plaintiffs testify that he said he would not incorporate for six or seven years. Under the circumstances we must hold that the right of action and right to damages for the breach were completed when the defendant failed to respond to the demand for compliance with Paragraph 7 (b) of the contract, dated January 11, 1957. His belated compliance some two weeks later, with an offer to re-employ the plaintiffs comes too late and is not a valid defense in this cause.

■ ■ The second point raised by the defendant, that the plaintiffs were obliged to exercise reasonable efforts to mitigate their damages up to the time of the trial is a correct statement of the law. The plaintiffs must have used reasonable diligence in procuring other employment and any sums so realized should have been deducted from the amount due them. Doherty v. Schipper & Block, 250 Ill. 128, 133. Mount Hope Cemetery Ass'n v. Weidenmann, 139 Ill. 67. The damages awarded by the court are not itemized and it is impossible for this court to determine if the trial court took into consideration the amounts earned by the plaintiffs after the termination of their employment by the defendant, but it seems logical to assume that these amounts were taken into consideration in arriving at the amount of damages. However, there is nothing in

the record to show that the plaintiffs did not use reasonable diligence in seeking employment and thereby mitigating the damages.

The third point is that the judgment is grossly excessive. Defendant argues that at best the plaintiffs would only be entitled to $50 per week for 27 weeks or a total of $1350, and that when the plaintiffs quit their employment, their rights, if any, to compensation from the defendant were cut off. If this theory of the defendant is correct, the limit of damages the plaintiffs could recover is' for the 27 weeks in which they were in employment at $50 per week. Our courts have held otherwise. In the case of Keel v. Illinois Terminal R. Co., 346 Ill. App. 169, it was held that if an employee treats the contract as terminated and seeks once for all, the damages he has sustained by the breach of contract, he is not limited to damages accrued up to the time of the suit. Then the measure of damages is based upon the whole contract, less such sum as he did, or might earn by reasonable diligence after the breach. In the case of Paramount Pictures Distributing Corp. v. Gehring, 283 Ill. App. 581, the court in discussing the rule as to damages for breach of contract quoted the general rule as stated in 17 C. J., pp. 847, 848, as follows: "The measure of damages in the case of a breach of contract is the amount which will compensate the injured person for the loss which a fulfillment of the contract would have prevented or the breach of it has entailed. In other words, the person injured is, so far as it is possible to do so by a monetary award, to be placed in the position he would have been in had the contract been performed."

In Underground Const. Co. v. Sanitary Dist. of Chicago, 367 Ill. 360, the court said: "It has been the rule in this country and England since the early case of Hadley v. Baxendale, 5 English Ruling Cases 502, (8 R. C. L. 451, par. 22), that 'The damages recoverable

446

for a breach of contract are such as may fairly and reasonably be considered as arising naturally—that is, according to the usual course of things—from the breach of the contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach of it.' "

■ If this court interprets these cases correctly, the plaintiffs were not limited to 27 weeks of wages at $50 per week, but were also entitled, upon the breach of the contract to sue for and recover their damages from the termination of their employment to the date of trial, and for any damages which would compensate them for the loss the breach of the contract entailed. Following this line of reasoning further, the plaintiffs acting upon a contract with the defendant left their home in Denver and moved to Springfield. They contemplated working for the defendant or the contemplated defendant corporation for such period of time until they would own the business. Under the law of the Paramount Pictures v. Gehring case, they could be entitled to an amount in damages that would compensate them for the loss which the fulfillment of the contract would have prevented, namely steady employment and a gradual ownership of their own business.

■ Considering all these elements of damages, we must hold that the trial court could and probably did consider all these elements in arriving at the amount of damages sustained by the plaintiffs, and taking all these elements into consideration, the judgment is not excessive.

Affirmed.

ROETH, P. J. and CARROLL, J., concur.